## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JUAN J. GUALLINI INDIJ, AND RAQUEL MEDINA RAMPOLLA**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**BANCO POPULAR DE PR, AND ABC INSURANCE COMPANY**<br><br>**Defendants** | **Civil No.** *(Refer to Summons)*<br><br>**Lender's Liability, Breach of Contract, Tortious Conduct, Tortious Interference, *Culpa in Contrahendo*, Pursuant to 12 U.S.C. § 2601 *et seq.*, 12 C.F.R. § 1024, PR Laws Ann. tit. 31 §§ 3391, 3401, & 5141.** |

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

**TO THE HONORABLE COURT:**

**COME NOW,** Juan Guallini Indij and Raquel Medina Rampolla ("Plaintiffs"), through the undersigned attorney, and very respectfully state, allege and pray as follows:

## JURISDICTION

1. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. 1332(a). The amount in controversy exceeds the threshold amount of seventy-five thousand dollars.

2. This Court also has supplemental jurisdiction regarding the claims under 12 U.S.C. § 2601 *et seq.*, and 12 C.F.R. § 1024, and the claims under state law arising under PR Laws Ann. tit. 31 §§ 3391, 3401, & 5141. These claims are interrelated with Plaintiff's federal claims and arise from a common nucleus of operative facts such that the adjudication of Plaintiffs' state law claims with Plaintiffs' federal claims furthers the interest of judicial economy.

## PARTIES

3. Plaintiffs Juan Guallini Indij and Raquel Medina Rampolla are residents of Decatur, in the State of Georgia, United States. The Plaintiffs are legally married and suffered damages as direct consequence of the predatory lending actions undertaken by the below described defendant.

4. Defendant Banco Popular de Puerto Rico (the "Defendant" or "BPPR") was a lender to Plaintiffs which committed and/or participated in acts against the Plaintiffs that ultimately led to their financial hardship, insolvency and forced them to seek relief under the provisions of the Bankruptcy Code. Defendant is a servicer of a "federally related mortgage loan" as that term is defined in Section 2602(1) of Title 12 of the United States Code.

5. Defendant ABC Insurance Company is, upon information and belief, the company that provides insurance protection to BPPR and is thus jointly liable with BPPR to Plaintiffs, in the full amount of damages to be determined by this Honorable Court, for the matters set forth herein.

6. The amounts claimed as part of the following causes of action may overlap. They can be considered individually, or they can be taken for the total amount listed in the final cause of action.

## BACKGROUND

7. On November 29, 2005, Plaintiffs constituted a mortgage in favor of BPPR, by means of deed No.734, guaranteed with a property located at Dorado Del Mar LL-29, Playa Street Dorado, Puerto Rico as collateral (the "Property"). The Property was the Plaintiffs' primary residence.

8. In December 2014, Plaintiffs hired a realtor in order to either rent or sell the property due to financial constraints.

9. Around April 2015, Plaintiffs contacted BPPR, to seek advice for their financial needs, specifically to reduce the payments for the mortgage through the process of "modification of monthly payments" and "sale of property" due to a reduction in their income and other economic hardship situations that affected Plaintiffs' payment capacity.

10. The Guallinis provided BPPR with the required documentation to be evaluated for a regular loan modification.

11. BPPR explained to Plaintiffs that the request for "loss mitigation" could prevent a mortgage foreclosure against them.

12. Also, on or around July 10, 2015, the Guallinis submitted a loss mitigation application requesting a loss mitigation alternative involving the surrender of the Property.

13. At that time, BPPR explained to Plaintiffs that, in order to apply for "Loss Mitigation", they had to stop making mortgage payments for at least three (3) months and intentionally incur in arrears to qualify for the loss mitigation process.

14. Trusting BPPR's advice, and the long relationship they had with the bank, Plaintiffs stopped making mortgage payments with the purpose of qualifying for the "loss mitigation" program.

15. Up to that point in time, they never had fallen behind with their payments on the mortgage. In fact, before their economic hardship and request to the bank for advice on how to properly attend the situation, Plaintiffs used to make contributions against the debt's principal to reduce the mortgage debt.

16. Prior to stopping making payments on the mortgage following the Bank's advice, Plaintiffs had an excellent credit scores and had never faced any collection action against them.

17. On September 8, 2015, BPPR sent Plaintiffs a letter denying their request for modification of monthly payments. Plaintiffs were told by the bank's representative that a short sale was an option upon the denial of a loan payment modification.

18. Despite the bank's advice to make the Guallinis incur in arrears, the lender commenced its predatory actions and, on November 13, 2015, BPPR filed a complaint against Plaintiffs for

collection of moneys and mortgage foreclosure, Civil Case Num. #DCD2015-2735 at the Bayamon Part of the Puerto Rico Court of First Instance (the "State Court"). On November 30, 2015, Plaintiffs were served with the foreclosure complaint.

19. Meanwhile, on or around December 2015, Plaintiffs received an offer to purchase the property in a "short-sale" for $130,000.00 (the "$130k Offer") and on December 28, 2015, Plaintiffs sent BPPR a letter forwarding the offer.

20. On January 11, 2016, while still considering Plaintiffs' loss mitigation request, BPPR filed a motion in the State Court requesting an order for entry of default and requesting judgment in the foreclosure proceeding against Plaintiffs.

21. On or around February 19, 2016, the State Court issued a default judgment on the foreclosure proceeding.

22. On or around February 27, 2016, BPPR evaluated Plaintiffs' $130k offer and requested to perform an appraisal of the Property. The Property was appraised with a value of $170,000.00. At that time, Plaintiff's mortgage principal balance was $186,000.00, and BPPR denied the $130k Offer.

23. On or around March 8, 2016, Plaintiffs sent a new request for "loss mitigation" for the purchase of the Property in a "short-sale" for $150,000.00 to BPPR (the "$150k Offer").

24. On or around March 11, 2016, BPPR sent Plaintiffs an email, denying the $150k offer and made a valid, binding counteroffer for $170,000.00 for Plaintiffs to meet and move to execute a short sale.

25. On or around March 18, 2016, the prospect buyers, who initially made the $150k Offer, increased the same for an additional $4,000.00, for a total amount of $154,000.00, which Plaintiffs

informed to BPPR (the "$154k Offer"). On or around March 24, 2016, BPPR electronically notified Plaintiffs that they were denying the $154k Offer.

26. On June 29, 2016, the State Court issued a public bid notice for the Property, which was notified to Plaintiffs by BPPR's legal representation on September 1, 2016. The public bid notice scheduled public bids for October 19, October 26, and November 2, 2016.

27. On or around September 7, 2016, Plaintiffs attended BPPR's offices with another short sale offer for $145,000.00 (the "$145k Offer"). BPPR told Plaintiffs that the case would be discussed with the bank. Also, about that same date, Plaintiffs served BPPR with a letter explaining the imminent loss of income.

28. On September 9, 2016, BPPR considered the loss mitigation application for the $145k Offer as complete, and attempted to call the Guallinis to inform them that their case would not go on short sale because of the offer and that the surrender of the Property should be furthered. BPPR considered that the Guallinis' request for short sale was complete as to pass judgment and inform the client the outcome on the same. Notwithstanding their obligation to stop the foreclosure, BPPR did not stop such ongoing proceedings at the State Court level and continued its predatory conduct.

29. On or around September 19, 2016, BPPR issued a letter to Plaintiffs denying the $145k Offer but not on grounds related to the offer's amount. Defendant BPPR alleged that Plaintiffs had the capacity to continue satisfying their monthly mortgage payments with current assets and/or money reserves. The bank based its determination on mistaken financial information and ignored the Plaintiffs' letter explaining the imminent loss of income.

30. Also, at this juncture, BPPR did not offer Plaintiffs any qualifying property-retention alternatives in loss mitigation other than a short sale. BPPR failed to review for all loss mitigation

options available to the Guallinis on the $145k Offer which was deemed as a complete loss mitigation application by the Defendant.

31. On or around September 26, 2016, Plaintiffs cancelled their certificate of deposit to meet the $170,000.00 counteroffer made by BPPR throughout the loss mitigation process.

32. On or around October 14, 2016, Plaintiffs attended BPPR's offices and submitted another proposal based on a purchase agreement the Guallinis had entered into on or around August 27, 2016, with Mr. Merced Mora for $160,000.00 (the "$160k Offer"). This offer was also denied by BPPR based on the same mistaken income information and their request that the Plaintiffs pay the appraisal value. BPPR failed to exercise reasonable diligence and again considered the incorrect income information from the Guallinis.

33. On or around October 17, 2016, Plaintiffs attended BPPR's offices and met BPPR's counteroffer to pay the appraisal value of $170,000.00 (the "$170k Offer and/or Defendant's Counteroffer"), according to BPPR's offer and own procedures. The $170k Offer consisted of $160,000.00 from Mr. Merced Mora and $10,000.00 that Plaintiffs obtained by having cancelled their certificate of deposit with BPPR.

34. Due to the fact that Plaintiffs met BPPR's Counteroffer and that the Defendant acknowledged the Guallinis' true financial condition, on or around October 25, 2016, the Bank issued Plaintiffs a letter approving the short sale (the "Short Sale Approval Letter"). This letter was first handed to plaintiff Juan Guallini personally upon his attendance and persistence to reach a short sale with BPPR. Thus, on the same date of the Short Sale Approval Letter was issued, the Guallinis accepted its terms and conditions. A short sale contract had been perfected (the "Short Sale Contract").

35. The Short Sale Approval Letter requested Plaintiffs to communicate with BPPR prior to November 2, 2016 (the date of the foreclosure). In addition, the Short Sale Approval Letter stated that "among the benefits from this alternative, the foreclosure proceeding shall be avoided and shall eliminate or reduce the mortgage debt" over the Property.

36. Also, on or around October 25, 2016, upon the Short Sale Contract reached with BPPR, the Plaintiffs executed an addendum to the purchase agreement with Mr. Merced Mora and extending its terms until November 30, 2016.

37. On October 26, 2016, at 9:42 a.m. Plaintiffs forwarded an email from their realtor Marilia Colón to Yashira Melecio, with copy to Abdiel Guzman from BPPR, on the official documentation needed from BPPR to close on the short sale.

38. Also, on October 26, 2016, at 4:51p.m., the Plaintiffs sent an email to Yashira Melecio from BPPR requesting to be called back regarding the short sale.

39. Later that same day, Yashira Melecio from BPPR called back Plaintiffs and stated that the short sale process would be taken over by BPPR and Money House as financial institutions and that their part was done regarding the short sale. Trusting their lender and the representations made by BPPR, Plaintiffs rested assured that their Property would be handled through the loss mitigation Short Sale Contract perfected with BPPR, and that the Property would not be foreclosed.

40. As a result of BPPR's approval of the $170,000.00 offer, on November 2, 2016, Plaintiffs' realtor sent Plaintiffs an electronic communication confirming the availability of all requested documents and Mr. Merced Mora having executed all mortgage origination documents to finalize the sale. Also, around such date, the mortgage's originator, Money House, electronically confirmed that Mr. Merced Mora had executed all required documents.

41. On November 4, 2016, Plaintiffs' realtor sent Plaintiffs an electronic communication with all documents requested by Money House. At that juncture, Plaintiffs had already submitted all requested documents, and all communications regarding the short sale were left between Money House and BPPR, pursuant to BPPR's instructions.

42. On December 1, 2016, Money House requested a pay-off balance and/or certification that the Property had no homeowner maintenance fees debt.

43. By December 9, 2016, Mr. Merced Mora had delivered all required documents; however, to Plaintiffs' surprise, on that date, BPPR informed that the Property had been sold through the public auction previously held on November 2, 2016.

44. BPPR did not file motions in the foreclosure proceeding against Plaintiffs to stop the foreclosure at any relevant stage concerning the $130k Offer, $150k Offer, $154k Offer, $145k Offer, $160k Offer, and ultimately on the $170k Offer; such offers were submitted separately and were not duplicative or overlapped. The $170k Offer created a binding contractual obligation, which stated that the short sale "shall" avoid the foreclosure for the Property.

45. In March 2017, Plaintiffs learned that BPPR had conducted the sale of the Property to Mr. Merced Mora, the very same prospect buyer from Plaintiffs, who, at that juncture, was living at the Property. BPPR sold the Property to Mr. Merced Mora for $160,000.00.

46. Nevertheless, even after BPPR put the Guallinis out of the way by foreclosing upon the Property on November 2, 2016, the Guallinis discovered that the actual sale to Mr. Merced Mora had taken place on January 13, 2017; more than two (2) months after the foreclosure.

47. At this stage, Plaintiffs believed that, because of the foreclosure and upon BPPR's clear breach of contract, they would stop their collection offensive against them.

48. However, by the end of March 2017, Plaintiffs were served with a motion from the foreclosure proceedings which indicated that BPPR would seize Plaintiffs' bank accounts and assets because they would pursue a deficiency claim of $114,774.72 against them which caused a series of events that led to the suffering of damages, including the filing of a bankruptcy petition.

49. In April 2017, Plaintiffs received a garnishment order from the State Court, authorizing the bank to seize anything belonging to Plaintiffs and ordering the seizure of any bank account in their name, furthermore the order directed, among other things, that any employer retain 25% of their earnings in order to satisfy BPPR's alleged debt, among other remedies afforded to the predatory lender.

50. In this case, despite all representations by BPPR, Plaintiffs were unable to reduce their mortgage loan payments and were still submitted to multiple, lengthy loss mitigation processes, to no avail. Instead, BPPR's representations and Plaintiffs' compliance with their requests eventually resulted in Defendant's filing of a foreclosure proceeding against them, and, ultimately, in the sale of the Property by BPPR to Mr. Merced Mora, disposing of Plaintiffs' Property while fraudulently taking them out of an approved transaction that had the binding contracted term of avoiding foreclosure.

51. BPPR utterly violated its own procedural loss mitigation manual, breached the Short Sale Contract and still sought the collection of the deficiency in March 2017 resulting from the mortgage foreclosure against Plaintiffs. These events have caused the Plaintiffs severe damages in all forms, including by having to run and protect their assets from the lender that they once trusted.

52. Due to the aforementioned facts and to protect their assets from the garnishments order, on December 27, 2017, Plaintiffs were forced to file a voluntary petition under the provisions of

Chapter 13 of the Bankruptcy Code, Bankruptcy Case No. 17-07489, pending before the Bankruptcy Court for the District of Puerto Rico.

53. Defendant's predatory actions triggered the filing of the bankruptcy petition, which had a direct effect on Plaintiffs' lives. Plaintiffs have sought psychological assistance to cope with their new dire situation.

54. Around December 2018, the Plaintiffs moved to the city of Decatur, in the state of Georgia, United States, to start anew. However, in Georgia, Plaintiffs were suffering emotional damages as a direct consequence of BPPR's predatory actions and as a consequence of having filed for bankruptcy to stop the effects of the garnishment order that BPPR had against them.

55. On February 4, 2019, the Guallinis filed adversary proceeding No. 19-00012 at the Bankruptcy Court for the District of Puerto Rico to assert their claims against BPPR and subordinate their claim based on its predatory actions against them (the "Adversary Proceeding"). The main purpose of the Adversary Proceeding was to subordinate BPPR's the deficiency claimed against the Guallinis upon foreclosing on the Property and seeking damages in relation to multiple statutes.

56. By then, Plaintiffs' credit was severely affected primarily because of the forced request for bankruptcy relief.

57. Also, because of their bankruptcy status, the Guallinis suffered the denial of real property leases, the denial of credit to acquire real property, and denials of credit card applications.

58. The Guallinis also lost opportunities to obtain beneficial financial terms as part of the damages caused by BPPR's bad faith and predatory maneuvers.

59. After the bankruptcy filing, one of the Guallinis' parents passed away. Upon such demise, the Guallinis obtained enough funds through inheritance which were utilized to pay for the bankruptcy plan in full.

60. Thus, between April 29, and 30, 2021, the Gualllinis amended their bankruptcy schedules and plan, and paid off the standing balance of their Chapter 13 plan via cashier's check serial #6700801195 to close the bankruptcy and leave behind this bitter chapter of their lives.

61. Furthermore, upon the bankruptcy payoff the Guallinis shall withdraw the allegations contained in the Adversary Proceeding to be accumulated in this captioned proceeding for which this Honorable Court exercises primary jurisdiction.

62. Plaintiffs' damages suffered are still accruing as of the date of this filing.

## FIRST CAUSE OF ACTION – PREDATORY PRACTICES, LACK OF GOOD FAITH, AND BREACH OF CONTRACT UNDER PUERTO RICO CONTRACTUAL LAW AND REQUEST FOR DAMAGES

63. Plaintiffs re-allege and re-incorporate all prior allegations as though fully set forth herein at length.

64. Under Puerto Rico law, the elements of a cause of action for breach of contract are (1) a valid contract, (2) a breach by one of the parties to the contract; and (3) resulting damages. *See* Mega Media Holdings, Inc. v. Aerco Broad. Corp., 852 F. Supp. 2d 189, 199–200 (D.P.R. 2012).

65. Under Puerto Rico law, "the consent of the contracting parties is an essential element of a contract. *See* 4 P.R. Laws Ann., tit. 31, § 3391. 'Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.'" *See* Marrero–Garcia v. Irizarry, 33 F.3d 117, 122 (1st Cir.1994) (citing 31 P.R. Laws Ann. tit. 31, § 3401). In Puerto Rico, "an agreement can be binding without executed documentation if, inter alia, the parties have a 'meeting of the minds expressed through the offer and the acceptance.'" *See* Ysiem Corp. v. Commercial Net Lease Realty, Inc., 328 F.3d 20, 23 (1st Cir.2003) (citing Producciones

Tommy Muñiz, Inc. v. Comite Organizador de los VIII Juegos Panamericanos, 13 P.R. Offic. Trans. 664, 113 D.P.R. 517 (1982)4). Also, Puerto Rico law stipulates three requirements for a valid contract: (1) the contracting parties' consent; (2) a definitive, legal object of the contract; and (3) consideration. *see* Mega Media *at* 200 (D.P.R. 2012)

66. In the captioned case, a valid short sale contract was perfected between the parties and consent was perfected at the precise moment when the Plaintiffs met Defendant's Counteroffer. Also, a binding contract was formed when BPPR issued the Short Sale Approval Letter for the short sale given the Plaintiffs' reiterated intentions to consummate a loss mitigation short sale process. The Short Sale Contract could also be considered perfected based on the Guallini's communications with BPPR as requested in the Short Sale Approval Letter. Furthermore, based on the Short Sale Contract with BPPR, Plaintiffs and Mr. Merced Mora executed an addendum to the purchase contract between them, against which BPPR later interfered.

67. The legal object of the short sale contract was the Guallinis' Property and the transfer of such mortgaged residence; its cause was to free the Guallinis' from its obligations with BPPR while this Defendant would extinguish its credit upon the receipt of $170,000,00 in exchange for avoiding the foreclosure. Thus, there should be no doubt that a valid and perfected contract existed between Plaintiffs and Defendant for the short sale of the Property which, upon BPPR's own representations, had the effect of avoiding foreclosure, which ultimately BPPR negligently or intentionally violated.

68. Because a valid contract existed, regarding the second prong for breach, BPPR failed to comply with its obligations under the short sale contract with the Guallinis by failing to stop foreclosure of the Property, having sold the same to Mr. Merced Mora, which was Plaintiffs' own proposed short sale buyer. Also, BPPR made efforts to collect the resulting "deficiency" directly

resulting from the breach and the sale to Mr. Merced Mora, after having removed Plaintiffs from the negotiations to foreclose the Property and later go against the Guallinis for a $114,774.72 deficiency claim.

69. By not honoring the Short Sale Contract, BPPR positioned itself in a favorable economic position. They were able to get $160,000 from Plaintiffs' purchaser and later could garnish and confiscate $114,774.72 from the Guallinis, which was well above the principal amount of around $185,000.00 that Plaintiffs had as balance in their mortgage.

70. Under the Short Sale Contract, BPPR would get $170,000.00 in this creditor facility and instead, Defendant by breaching their contact and in bad faith, decided to collect $160,000.00 from Mr. Merced and $114,774.72 from the Guallinis for a complete return on the credit facility in the amount of $274,774.72. The predatory practices from BPPR are shameful and sanctionable, to say the least.

71. On the other hand, an action for damages for breach of contract only lies when the damage suffered exclusively arises as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract. *See* Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 P.R. Dec. 712 (1992). The Guallinis were damaged by BPPR's actions, which exclusively arised from Defendants' breach of the Short Sale Contract.

72. The Guallinis were forced to file a voluntary bankruptcy petition under Chapter 13 of the Bankruptcy Code in order to stay BPPR's collection efforts despite BPPR's representations and the existence of a Short Sale Contract. Prior to the Petition Date, Defendant BPPR represented to Plaintiffs that the $170k Offer and/or Defendant's Counteroffer had been approved, and that such approval had the purpose and result of consummating the sale of the Property for the cancellation of the mortgage lien over the Property, as well as to avoid the foreclosure process.

73. The good faith requirement is a guiding principle of all legal dealings and consists of the "loyalty in the dealing, the honest and faithful conduct. It presumes the keeping of the given word and not [defrauding or abusing] trust; it presumes a manner of conduct as it should be expected from those who, with an honest thinking, take part in the traffic as contractors." *See* Arthur Young & Co. v. Vega III, 136 P.R. Dec. 157 (1994); *see also*, Berríos v. U.P.R., 116 D.P.R. 88 (1985); Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982); Velilla v. Pueblo Supermarkets, Inc., 111 D.P.R. 585 (1981); Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 876 n. 4 (1976).

74. Therefore, as a direct consequence of BPPR's breach of the Short Sale Contract with Plaintiffs, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in significant attorney fees, costs and expenses.

**SECOND CAUSE OF ACTION –LENDER'S LIABILITY, FAILURE TO COMPLY WITH LOSS MITIGATION PROCEDURES, VIOLATION TO LENDER'S REQUIRED STANDARD OF CARE, DUAL TRACKING PURSUANT TO RESPA (12 U.S.C. § 2601 *et seq.*), REGULATION X (12 C.F.R. § 1024), AND REQUEST FOR DAMAGES**

75. Plaintiffs re-allege and re-incorporate all prior allegations as though fully set forth herein at length.

76. BPPR is a servicer of a "federally related mortgage loan" on residential real property as that term is defined in Section 2602(1) of Title 12 of the United States Code. Also, the Eleventh Circuit has stated, in particular in cases related to loss mitigation violations pursuant to Section 1024.41, that RESPA recognizes two types of damages which are an essential part of a RESPA claim: "(1) actual damages the borrower sustained as a result of the RESPA violation and (2) 'any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section.'" *See* Lage v. Ocwen Loan Servicing LLC, 839 F.3d 1003,

1011 (11th Cir. 2016 (quoting 12 U.S.C. §2605(f)(1)) *see also* <u>Gonzalez-Camacho v. Banco Popular De P.R.</u>, 318 F. Supp. 3d 461, 484 (D.P.R. 2018)

77. In order to stay BPPR's collection efforts against Plaintiffs, which Defendant BPPR sought despite having represented its acceptance to Plaintiffs' $170k Offer/Defendant's Counteroffer, Plaintiffs were pursued by a predatory lender and forced to file a voluntary petition for relief under the provisions of Chapter 13 of the Bankruptcy Code.[1] Prior to the filing of the bankruptcy petition, Defendant BPPR represented to Plaintiffs that the $170k Offer and/or Defendant's Counter Offer had been approved, and that such approval **had the purpose and result of consummating the sale of the Property for the cancellation of the mortgage lien over the Property, as well as to avoid or stop the foreclosure process**.

78. Defendant BPPR continued with the State Court foreclosure and public bid process over the Property, and thereafter sold the Property to Mr. Merced Mora, the same individual who acted as proposed buyer in the approved $170k Offer and/or Defendant's Counteroffer, having removed Plaintiffs out of the transaction devoid of any explanations, communications or legal basis. These actions by BPPR are not only in violation of the principles of good faith negotiations but are also illegal and in patent disregard to Plaintiffs' prolonged best efforts to mitigate losses, and their reliance on BPPR's representations to avoid a state of insolvency which resulted in BPPR's thirst for more funds to satisfy more than the Guallinis owed. In addition, after these events, BPPR egregiously continued collection efforts against Plaintiffs for a "deficiency" of approximately $114,774.72, which is herein claimed by the Guallinis as actual damages, that

---

[1] The statue of limitations for the several causes of actions included in the Adversary Proceeding were preserved though the filing of Bankruptcy Case No. 17-07489 pursuant to the provisions of Section 108 of the Bankruptcy Code. *See* 11 U.S.C. § 108.

resulted from the sale to Mr. Merced Mora at a lower amount in relation to its lien over the Property.

79. Also, BPPR's conduct repeatedly violated the provisions of Respa and Regulation X. Prior to, or more than, thirty-seven (37) days before the scheduled foreclosure of the Property (end of August/beginning of September 2016), Plaintiffs applied for short sale with BPPR. The Defendant deemed Plaintiffs' request for short sale complete as to pass judgment and attempt to inform an outcome on the same. However, BPPR did not stop the ongoing foreclosure proceedings at the State Court in violation of 12 CFR § 1024.41(g). Also, no denial notice in writing was issued by BPPR to the Guallinis by such date in violation of 12 CFR § 1024.41(c)(1)(ii).

80. Furthermore, at that juncture, BPPR denied the Guallinis' application based on mistaken income information and not based on the short sale offer. Regardless, BPPR did not propose to Plaintiffs any qualifying property-retention alternatives in loss mitigation other than a short sale. Thus, BPPR failed to review for all loss mitigation options available to the Guallinis on the $145k Offer which was deemed complete by the Defendant 12 CFR § 1024.41(c)(1)(i).

81. Also, on October 25, 2016, BPPR approved the short sale of the Property and the Short Sale Contract was perfected with the Guallinis. However, BPPR did not honor Regulation X's purpose and protections against the loss of the Guallini's main residence through foreclosure despite the approval of the short sale and perfection of the Short Sale Contract.

82. The foregoing constitutes a pattern of, at least, four (4) instances of non-compliance with the provisions of RESPA/Regulation X which led to the foreclosure of the Property and is cause to entitle the Guallinis to statutory damages against BPPR.

83. As a result, Plaintiffs emerged from the requests for "loss-mitigation", directed by BPPR's own guidance, **in a worse financial position that they were in before such endeavors**,

despite complying with Defendant's multiple representations and requests. This inequitable, dual tracking conduct of bad-faith negotiations is not only forbidden by law, it also violates basic tenants of good faith and standard of care as well as contractual law.

84. A plaintiff seeking actual damages under 12 U.S.C. § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA. Sutton v. CitiMortgage, Inc., 228 F.Supp. 3d 254 (2017), *citing* Roth v. CitiMortgage Inc., 756 F.3d 178, 181 (2nd Cir. 2014)

85. BPPR's inequitable conduct is in violation of RESPA, Regulation X and other related loss mitigation statutes, as well as Puerto Rico contractual Law; Plaintiffs' insolvency for which a Chapter 13 reorganization was sought was a direct consequence of Defendant's inequitable actions and their status as bankrupts has caused severe damages. At all relevant times, Plaintiffs relied on BPPR's guidance to protect their finances, and BPPR, as a lender with influence over Plaintiffs, encouraged Plaintiffs to seek relief pursuant to the loss mitigation procedures, to no avail, despite having a binding Short Sale Contract to avoid the foreclosure, and to later sell to their prospect buyer and pursue a deficiency.

86. As a direct consequence of BPPR's failure to comply or pattern of noncompliance with the requirements with the provisions of applicable federal statutes, including RESPA and Regulation X, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, statutory damages, and had to incur in attorney fees, costs and expenses. In addition, this Honorable Court should impose punitive damages against this lender, as applicable.

### THIRD CAUSE OF ACTION – DAMAGES FOR DEFENDANT BPPR'S TORTIOUS CONDUCT, TORTIOUS INTERFERENCE AND *CULPA IN CONTRAHENDO*

87. Plaintiffs re-allege and re-incorporate all prior allegations as though fully set forth herein at length.

**A.  BPPR's Tortious Failure to Comply with its Own Established Procedures.**

88. Under article 1802 of the Puerto Rico Civil Code, a person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.

89. Also, most of the provisions regarding RESPA and Regulation X are incorporated in BPPR's internal protocols and procedures.

90. However, prior to, or more than, thirty-seven (37) days before the scheduled foreclosure of the Property (end of August/beginning of September 2016), Plaintiffs applied for short sale with BPPR. The Defendant deemed Plaintiffs' request for short sale complete as to pass judgment and attempt to inform an outcome on the same. However, BPPR did not stop the ongoing foreclosure proceedings at the State Court as stated in its own procedure's manual. Also, no denial letter was issued by BPPR by such date.

91. Furthermore, at such juncture, Defendant BPPR was considering incorrect financial information from the Plaintiffs to deny a short sale alternative, despite being in possession of information which indicated an imminent permanent loss of income by Plaintiffs.

92. Also, even assuming, in arguendo, that BPPR considered the correct financial information from Plaintiffs, Defendant failed to offer the Guallinis any loss mitigation alternative to retain their property despite retention options being in the upper hierarchy of the loss mitigation options established by Defendant BPPR itself in its manuals or guidelines. The Defendant tortiously failed to comply with its own procedures to Plaintiff's prejudice.

93. Therefore, as a direct consequence of BPPR's tortious actions, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in attorney fees, costs and expenses.

B. **Tortious Interference with the Contract between Plaintiffs and Mr. Merced Mora.**

94. Here, it is obvious that BPPR acted negligently by issuing a letter to Plaintiffs indicating that the foreclosure would be avoided, but about a week later foreclosed on the Property. As such, it is undisputed that BPPR not only breached its duty of care and contractual duties, but also acted with tortious conduct and negligently against Plaintiffs.

95. Notwithstanding this, the Plaintiffs, as lay people, were under the impression that upon the BPPR's foreclosure and prior representations, this Defendant would no longer continue to utterly pursue collection against Plaintiffs.

96. However, to Plaintiffs' surprise, in March 2017, the Plaintiffs were served with a motion to execute judgment after foreclosure, for a deficiency claim of $114,774.72, asking the State Court for an order to foreclose bank accounts and other financial instruments, notwithstanding that Plaintiffs were represented by BPPR that the foreclosure was avoided by the Short Sale Contract from October 25, 2016.

97. The Motion to execute judgment surprised the Plaintiffs and caused severe emotional damages and distress and forced them to run from BPPR' predatory actions and seek protection of their assets, living under the constant fear of finding that their hard-earned savings were about to be erased. Ultimately, after living under the fear of the actions of this predatory lender, the Plaintiffs were forced to file for bankruptcy relief.

98. Also, on or around March or April 2017, the Guallinis became aware that this predatory lender had interfered with their purchaser, Mr. Evaristo Merced and that he was living the Property.

99. Under 31 P.R. Laws Ann. § 5141, a claim for tortious interference with a contract requires a plaintiff to establish four elements: 1) the existence of a contract; 2) a tortious act by a

defendant with knowledge of the contract's existence; 3) injury, and 4) proximate causation. Collins v. Martinez, 709 F. Supp. 311, 1989 U.S. Dist. LEXIS 2825.

100. Here, there was a valid agreement executed by Plaintiffs and Mr. Merced Mora. Defendant BPPR, with knowledge of the existence of the contract between Plaintiffs and Mr. Merced Mora, removed Plaintiffs from the transaction and sold the Property to Mr. Merced Mora directly.

101. Plaintiffs suffered economic and emotional injuries as a direct result of Defendant BPPR's interference with the Purchase Agreement between Plaintiffs and Mr. Merced Mora, inasmuch as Defendant and Mr. Merced Mora removed Plaintiffs from the legal transaction, and, as a result thereof, Defendant continued collection efforts against Plaintiffs for the "deficiency" of $114,774.72, thereby causing actual damages for such amount, and forcing Plaintiffs to incur in attorney's fees, expenses and costs against such collection efforts.

102. Therefore, as a direct consequence of BPPR's tortious actions, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in significant attorney fees, costs and expenses.

C. *Culpa in Contrahendo* **regarding the Short-Sale in the Loss Mitigation Process, in connection with the Purchase Agreement between Plaintiffs and Mr. Merced Mora, and request for damages.**

103. Plaintiffs re-allege and re-incorporate all prior allegations as though fully set forth herein at length.

104. Under the Puerto Rico doctrine of *culpa in contrahendo*, negotiations toward an agreement can [even without a letter of intent] readily give rise to mutual expectations that the parties will bargain in good faith and refrain from misconduct. The doctrine is designed primarily to protect reliance rather than expectation interests. A party's withdrawal from contractual negotiations may be considered to be a violation of the duty of good faith if: (1) the withdrawal

was arbitrary or without justification; and (2) the other party had a reasonable expectation that a contractual agreement would be consummated. Advanced Flexible Circuits, Inc., v. GE Sensing Insp. Techs. GmbH, 781 F.3d 510, U.S. App. LEXIS 4615.

105. This "doctrine applies even if the Defendant's conduct was not intentional, but merely negligent." WHTV, 460 F. Supp. 2d at 306; see also [**16] Glamorous Nails, 167 P.R. Dec. at 46

106. Here, Defendant BPPR effectively approved the Short-Sale Agreement executed by Plaintiffs and Mr. Merced Mora, and further represented its interest in finalizing such Short-Sale for the purpose of freeing Plaintiffs from any lien obligations with BPPR, and eliminating any mortgage debt in favor of Plaintiffs, as well as avoiding the foreclosure process initiated by BPPR against Plaintiffs at the State Court. BPPR's Short Sale Approval Letter stated that "among the benefits from this alternative, the foreclosure proceeding shall be avoided and shall eliminate or reduce the mortgage debt" over the Property.

107. Furthermore, without providing any type of notice or justification whatsoever, Defendant withdrew from such transaction, in bad faith, to continue the foreclosure process against Plaintiffs' property against the Short Sale Contract already established and finalizing the sale of such Property to Mr. Merced Mora, arbitrarily removing Plaintiffs from the transaction.

108. Not only did Plaintiffs have an expectation in finalizing the transaction with Defendant BPPR, but they also relied on such Defendant's representations for years, with the sole purpose of eliminating the lien and mortgage debt owed to BPPR.

109. BPPR breached the Short Sale Contract with the Guallinis and in bad faith, decided to collect $160,000.00 from Mr. Merced Mora and $114,774.72 from the Guallinis for a complete return on the credit facility in the amount of $274,774.72. These predatory practices from BPPR are against the law and sanctionable as well.

110. Therefore, as a direct consequence of BPPR's tortious actions, the Guallinis suffered actual and emotional damages, loss of profits, pecuniary losses, and had to incur in attorney fees, costs and expenses.

**WHEREFORE,** Plaintiffs respectfully request an order granting the instant complaint, including BPPR's liability as a lender for breach of the Short Sale Contract, and/or under applicable provisions, including RESPA and Regulation X, and/or negligence, tortious interference, and/or *culpa in contrahendo* under Puerto Rico Law, without precluding the accrual of any amounts granted under the foregoing causes of action:

a) Actual damages in an amount no less than $114,774.72[2] as a direct consequence and result of BPPR's breach of contract, inequitable and tortious conduct, including the failure to comply with the provisions of RESPA and Regulation X.

b) Emotional damages in an amount no less than $250,000.00, without prejudice to this amount also qualifying as actual damages under any of the foregoing causes of action.

c) Loss of profits and pecuniary losses in an amount no less than $300.000.00 without prejudice to this amount also qualifying as actual damages under any of the foregoing causes of action.

d) Statutory damages under RESPA/Regulation X in an amount no less than $8,000.00 for at least four (4) instances denoting BPPR's pattern and practice of non-compliance with these regulations.

e) Attorney's fees, costs and expenses, in an amount no less than $90,000.00.

## **DEMAND FOR JURY TRIAL**

---

[2] Amount claimed by BPPR as "deficiency" on the foreclosure sale of the Property.

The Plaintiffs hereby demand a trial by jury on all claims, issues, and counts of the Complaint triable by such.

## **<u>VERIFICATION</u>**

We, the undersigned Plaintiffs certify under penalty of perjury that we have read the Complaint against BPPR, and that pursuant to 28 USC § 1746, the above stated is the truth, to the best of our knowledge and belief.



_____
Juan Guallini Indij

_____
Raquel Medina Rampolla

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, dated May 10, 2021.

**s/<u>Rafael E. Rivera-Sánchez</u>**
**RAFAEL E. RIVERA SÁNCHEZ**
U.S.D.C.-P.R. Bar No. 224309
P.O. BOX 191884
SAN JUAN, PR 00919-1884
PHONE NO. (787) 528-2062
email: rafaelrivera.lawoffice@gmail.com

_/s/ Javier Vilariño_
JAVIER VILARIÑO
USDC No. 223503
E-mail: jvilarino@vilarinolaw.com

_/s/ Roberto Negron_
ROBERTO NEGRON
USDC No. 305401
E-mail: rnegron@vilarinolaw.com

**VILARIÑO & ASSOCIATES LLC**
PO BOX 9022515
San Juan, PR 00902-2515
Tel. (787)-565-9894